**Dated: June 10, 2009**
**The following is SO ORDERED:**

George W. Emerson, Jr.
**UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TENNESSEE

_____

In re

HURRICANE MEMPHIS, LLC                    Case No. 08-24510-GWE
BEALE STREET PROPERTIES, LLC[1]           Case No. 08-24506-GWE
                                          (Jointly Administered)

        Debtor(s).                        Chapter 11

_____

## MEMORANDUM OPINION DENYING MOTION TO ASSUME LEASE AND
## DENYING CONFIRMATION OF DEBTOR'S PROPOSED CHAPTER 11 PLAN

_____

These matters are before the Court and pertain to the Chapter 11 cases of Hurricane

Memphis, LLC, (hereinafter "Hurricane") Case No. 08-24510 and 310 Beale Street Properties, LLC,

(or "310 Beale") Case No. 08-24506.  The two cases were filed on May 9, 2008 and have been

jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b) as set forth in this

Court's Order entered on June 24, 2008.

On December 31, 2008 a Chapter 11 Plan and Disclosure Statement were filed in Chapter

---

[1] Pursuant to the Court's Order Granting Motion for Joint Administration entered on June 25, 2008, all matters
in both of these Chapter 11 Cases were to be docketed in the lead case of In re Hurricane Memphis, LLC, Chapter 11
Case No. 08-24510.  This Memorandum Opinion resolves matters which were not docketed in accordance with the
Court's Order Granting Motion for Joint Administration and will therefore be docketed in both Chapter 11 Case No. 08-
24510, Hurricane Memphis, LLC and Chapter 11 Case No. 08-24506, Beale Street Properties, LLC.

11 Case No. 08-24506, in re 310 Beale Street Properties, LLC, and subsequently amended on March 16, 2009 with a Supplemental Amended Disclosure Statement being filed by Debtor 310 Beale on April 3, 2009.   Objections to the Disclosure Statement were filed by Creditors Wachovia Commercial Mortgage, Inc. f/k/a The Money Store Commercial Mortgage, Inc. (hereinafter "Wachovia"), the Shelby County Trustee, and Performa Entertainment Real Estate, Inc. (hereinafter "Performa").

After a hearing to determine the adequacy of the Disclosure Statement, the Disclosure Statement was approved as set forth in this Court's Order entered April 6, 2009, which also fixed April 24, 2009 as the last day for filing written objections to the proposed Chapter 11 Plan.

Objections to Confirmation of the Debtor's Proposed Amended Chapter 11 Plan were filed by Creditors Wachovia, Performa, United States of America on behalf of the Small Business Administration (hereinafter "SBA") and the Tennessee Department of Revenue with Wachovia filing a Supplemental Objection to Confirmation as well.[2]

In conjunction with the objections to confirmation, the Court also has before it Debtor 310 Beale's Motion to Assume Lease or Executory Contract and Performa's objection to that motion.

Currently pending in the Hurricane case and before the Court are the Debtor's Motion to Sell Personal Property to 310 Beale Street, LLC along with the objections to the Debtor's Motion to Sell filed by creditors Shelby County Trustee, Wachovia and Performa.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1134 and 157(a).  This is a core proceeding by virtue of 28 U.S.C. §§ 157(b)(2)(A) (motions to dismiss); 157(b)(2)(L) (confirmation of plans); 157(b)(2)(M) (leasing of property); and 157(b)(2)(N) (sale of property).

---

[2] Debtor 310 Beale filed a Memorandum on Confirmation Issues after the Court conducted its three-day hearing. The Court has reviewed the Memorandum and has taken the Debtor's arguments into consideration prior to drafting this Opinion.

## I. FACTUAL BACKGROUND

Debtor 310 Beale Street Properties, LLC was formed in 1999 to serve as tenant under a long-term lease with lessor Performa (the "Sublease Agreement" Tr. Ex. 1, 6/1/2009) on a parcel of real property located in the historic entertainment district known as Beale Street in Memphis, Tennessee.[3]  Debtor Hurricane held the franchise rights to, and for a period of time did operate, a restaurant and bar on Beale Street better known as Pat O'Brien's. Hurricane also owned personal property used in the operation of the restaurant and bar.  The two LLC's shared the same principals: Curtis Wegener and Kevin Kelly.  Mr. Kelly died in 2005 and Mr. Wegener is now the managing member of both Debtors.

The principals of the two Debtor LLC's obtained financing to build the Pat O'Brien's premises, located at 310 Beale Street, from Wachovia Commercial Mortgage, Inc.  The Debtors executed a promissory note (the "Wachovia Note"), dated December 20, 2001, in the original amount of $2,572,000.00.  To secure the Wachovia Note, the Debtors also executed a Construction Deed of Trust, as well as a Commercial Security Agreement which conveyed a security interest in all of Hurricane's machinery, equipment, furniture and fixtures.  There is no dispute as to the priority or perfection of Wachovia's claim as to the leasehold interest in the real property or security interest in the other collateral.

Mr. Curtis Wegener, the Debtor's principal, testified that the restaurant opened in September of 2001, and operated profitably until after Hurricane Katrina occurred in 2005 with the Wachovia Note eventually going into default in 2007.  Wachovia instituted foreclosure proceedings and the instant Chapter 11 petitions were filed on May 9, 2008, shortly before the foreclosure sale was to

---

[3] According to the testimony of John Elkington, the fee simple owner of the real property upon which the restaurant was built is the City of Memphis, who subsequently leased it to Beale Street Development Corporation, who subsequently leased it to Elkington and Keltner Properties, Inc., the predecessor to Performa, who subleased the real property to Chapter 11 Debtor 310 Beale, who in turn subleased the property to Chapter 11 Debtor Hurricane.

take place. Mr. Wegener further testified that in August of 2008, Pat O'Brien's, the restaurant managed by Hurricane and located on property leased from 310 Beale, closed and has not reopened because it continued to sustain post-petition losses.

## II.  PROCEDURAL BACKGROUND

Shortly after the filing of these Chapter 11 cases, Wachovia filed a motion to terminate the automatic stay or, in the alternative, for adequate protection, which resulted in an agreed order providing that the Debtor would make pre-confirmation adequate protection payments in the amount of $8,000.00 per month, starting in July of 2008. At the confirmation hearing, Mr. Wegener testified that all of the adequate protection payments had been made to Wachovia with the exception of the June, 2009 payment which would come due shortly after the confirmation hearing. Mr. Wegener further indicated that none of the payments had been made with funds from either Debtor, instead being paid by Mr. Wegener or some other entity under his control.

Hurricane moved to reject its sublease with 310 Beale and, there being no objection, its motion was granted. Hurricane also filed a motion to sell all of its personal property under 11 U.S.C. § 363  to Debtor 310 Beale with consideration for the sale being $1.00 along with the assumption of Hurricane's indebtedness to Wachovia secured by the personal property. Contemporaneous to the filing of the motion to sell, Hurricane filed a motion to dismiss its case pursuant to 11 U.S.C. § 1112(b) because it had ceased all operations and was continuing to incur quarterly fees payable to the United States Trustee as well as other administrative expenses to its detriment.

Wachovia, Performa and the Shelby County Trustee objected to the motion to sell. Wachovia objected to Hurricane's motion to dismiss and filed its own motion to dismiss the cases of both Hurricane and 310 Beale based on the Debtors' failure to present a plan of reorganization

4

and failure to continue to operate or make any payments to creditors other than the adequate protection payments to Wachovia. Wachovia's motion to dismiss was resolved via an agreed order granting the Debtors additional time within which to obtain confirmation of a Chapter 11 Plan or the jointly administered Chapter 11 cases would be dismissed effective immediately without further order of this Court. The deadline contained in the agreed order resolving Wachovia's motion to dismiss has been extended from time to time, with the current deadline being June 11, 2009.

Prior to the confirmation hearing, the Court granted the motion of 310 Beale to assume the Sublease Agreement with Performa over Performa's objection pending its subsequent ruling on the reasonableness of Performa's refusal to grant approval to 310 Beale to sublease the property to the reorganized Debtor 310 Beale Holding, LLC (hereinafter "310 Beale Holding").[4]

As set forth in the Court's oral memorandum opinion conditionally granting the motion to assume, Performa's objection to assumption of the lease was based in part on alleged uncured monetary defaults. The Court found, pursuant to the clear language of the Sublease Agreement, that no monetary defaults existed.

Performa's second argument was that the Sublease could not be assigned pursuant to the Debtor's Chapter 11 Plan or Sublease Agreement because the Plan had failed to provide a viable sublessee/tenant and therefore could not meet the feasibility requirement of 11 U.S.C. § 1129(a)(11). As the Court stated in its oral memorandum, in allowing the assumption of a lease, the Court essentially reimposes both the benefits and burdens of the lease upon the parties. While the Sublease Agreement was very liberal in its treatment of the Sublessee (Debtor 310 Beale) upon default, it

---

[4] As set forth in the Sublease Agreement, " Lessee may enter into such subleases as Lessee deems appropriate, subject to Lessor's right to approve the sublease thereunder and the trade name under which the sublessee operates the Property, which approval shall not be unreasonably withheld or delayed unless Lessor believes that the identity or character of the sublessee, or the trade name, character or nature of the business to be conducted in the Property is not consistent or compatible with the other businesses located in the Beale Street Historic District." Tr. Ex. 1at p. 17, ¶ 22.

5

provides the Lessor (Performa) with sufficient latitude to refuse to approve the assignment of the Sublease Agreement to a third party if that third party does not appear to be a viable business.  To put it simply, the Lessor should not be forced allow the assignment of the lease if the Debtor's Plan of Reorganization is not confirmable.

### III. THE PROPOSED PLAN

The Debtor's Amended Plan of Reorganization, filed on March 16, 2009 anticipates the forming of a new entity, 310 Beale Holding, LLC, to serve as the reorganized Debtor.  The members of the reorganized Debtor would be Center City Revenue Finance Commission, the Estate of Kevin Kelly, Guthrie Castle, Esq. and Curtis Wegener, who will also initially serve as managing member. 310 Beale Holding would then lease the premises out to a subtenant in an amount sufficient to pay proposed debt service to Wachovia as well as the claims of other classes receiving cash under the Plan.  Should any vacancy in the property exist, 310 Beale Holding or Curtis Wegener would maintain the necessary periodic payments on the reorganized Debtor's behalf.  According to the Amended Plan, vacancies are anticipated from time-to-time and will not be an event of default under the Plan.

The Plan anticipates that Hurricane, prior to dismissal, will sell all its personal property to the reorganized Debtor under the terms outlined above pursuant to 11 U.S.C. § 363.  The Court notes that the Debtor's Plan does not address Wachovia's ability to protect its security interest in the collateral via its right to credit bid pursuant to 11 U.S.C. § 363(k).  The Plan makes no provision for such an occurrence even though Wachovia reserved the right to credit bid in its objection to Hurricane's motion to sell the personal property.  Based on testimony offered by the Debtor at trial, it was clear that with the exception of the top-loading coolers currently installed at the premises, the use of the personal property was an integral part of the Debtor's proposed Plan. The proposed

6

transfer of the personal property to the Debtor would be in exchange for $1.00 and assumption of Hurricane's liability to Wachovia.

The Amended Plan of Reorganization, Amended Disclosure Statement and Supplement to Amended Disclosure Statement all provide that the success of the Debtor's Plan hinges on the Debtor subleasing the property to a tenant in order to make payments to its creditors. The identity of this tenant has recently changed. In its Amended Disclosure Statement the Debtor stated that it had negotiated a lease agreement with an entity by the name of Brentt, LLC. Attached to the Amended Disclosure Statement were several Exhibits which provided post-confirmation financial analysis of 310 Beale Holding based on revenues received from the proposed lease with Brentt, LLC. Based on the arguments of counsel for both the Debtor and its creditors, it appears that at some time following the filing of the Amended Disclosure Statement, Brentt, LLC reversed course and declined to enter into the lease agreement.

At the confirmation hearing on the proposed Amended Plan of Reorganization, the Debtor provided the Court with testimony and documentary proof pertaining to an alternate proposed lessee. The Debtor orally amended its Plan to provide for the leasing of the property to a new tenant, named Urban Enterprise Management, LLC (hereinafter "UEM"). The principals and members of UEM are: reorganized debtor 310 Beale Holding, Cato Walker, Curtis Givens and unidentified future capital investors of an unknown number. At the confirmation hearing, the Debtor provided the Court with a "Business Plan" entitled "An Introduction to Urban Enterprise Management". (Tr. Ex. 9, 6/1/2009). It is this tenant which is objectionable to Performa as well as unsecured creditor Beale Street Merchants Association.

The individual principals of UEM and Mr. Wegener testified at the confirmation hearing as to their various roles in the development of the "Business Plan" as well as what their duties would

be in running the business of the new tenant. The new tenant's revenues would be used to pay rents to the reorganized Debtor which would, in turn, use the rents to pay its debts. In short, the proposed Plan is based on the success of UEM in meeting all of the requirements necessary to open and operate a successful night club on Beale Street.

Pursuant to the testimony before the Court, as well as the UEM "Business Plan," UEM would be managed by member Cato Walker. Mr. Walker testified that he had extensive experience in dealing with businesses on Beale Street, having been instrumental in bringing some of the street's main tenants to the venue. Mr. Walker testified that he is a development consultant who has had prior association with other venues on Beale Street in various capacities. His main role in UEM would be administrative, with "Liquid on Beale," as the tenant would be known, being actually run on a day-to-day basis by Curtis Givens.

Mr. Walker and Mr. Wegener would be responsible for raising the investment funds necessary for the initial capitalization of UEM, expected to be approximately $400,000.00, with $375,000.00 of that being expenses for improvements to the building which would be necessary prior to the opening of "Liquid on Beale." (Tr. Ex.9, 6/1/2009). Mr. Wegener and Mr. Givens testified that the $400,000.00 figure was an estimate based on their past experience but that they currently have no quotes for any renovation costs. The remaining $25,000.00, according to Mr. Wegener's testimony, would serve as "working capital" to hire security guards and staff, purchase food and beverages and, assumedly, cover initial advertising and promotion costs. When pressed, Mr. Wegener admitted that if the initial amount was found to be insufficient, the members of UEM would have to either raise more or contribute from their own funds.

As of the confirmation hearing, none of the $400,000.00 in startup capital had been raised. Mr. Walker testified that he had not shown the "Business Plan" to any investors due to the fact that

8

UEM was not yet assured of being able to lease the property.  Mr. Wegener and Mr. Walker testified

that they anticipated it would take approximately sixty (60) to ninety (90) days to raise the

$400,000.00 in capital.  With the exception of Mr. Wegener, who will be servicing the Debtor's debt

until enough revenue is generated from operations to make monthly payments, neither Mr. Walker

nor Mr. Givens indicated that they would be personally providing any financial support for the

business.  Mr. Walker, when questioned by counsel, admitted that he had previously indicated at his

deposition that he could not at that time invest in the business, but at the confirmation hearing he

stated that his wife might.

 Curtis Givens, who is named in the "Business Plan" as "Vice President Operations" would

serve as the manager of business operations at "Liquid on Beale," responsible for staffing, training

and supervising employees.  According to Mr. Givens testimony, he operates three venues on a

limited basis each week.  According to the "Business Plan" provided to the Court, Mr. Givens owns

and operates The Silver Spoon restaurant and lounge.  Mr. Givens testified that The Silver Spoon

is open for lunch on weekdays as well as evenings on Wednesdays and Fridays.  On Friday and

Saturday nights, Mr. Givens operates a night club on American Way called "Level II." On Sunday

nights he rents and operates "Cactus Jack's" at yet another location.  In addition to these venues, he

would operate "Liquid on Beale," which he testified would be open three nights a week: Thursday

through Saturday.

 At the confirmation hearing, Mr. Givens was extensively questioned about his previously

filed personal Chapter 7 Bankruptcy Case, Case No. 08-26285, filed in June 26, 2008,  as well as

the Bankruptcy Case of Curtis Givens, Inc. dba The Premier dba Premier Night Club dba Club

Premier dba Premier, Chapter 7 Case No. 07-29729 (hereinafter "The Premier").[5]    Mr. Givens

testified that a sales tax audit had been performed by the Tennessee Department of Revenue on The

Premier and he was found to be owing over $400,000.00 in sales taxes, including interest and

penalties.

Mr. Givens testified that he was making arrangements to pay the debt owed to the Tennessee

Department of Revenue, but had not yet concluded the negotiation of the "offer to compromise" he

had made.  He stated that he still owes the taxes in question.  Mr. Givens also testified that he had

been forced to close the business after several security incidents resulted in lawsuits being filed

against either him or The Premier.  Mr. Givens stated that The Premier closed July, 2007.  Sometime

in April of 2008, Mr. Givens created the entity known as Level II Entertainment Complex, LLC and

then opened Level II in the same location that he had operated The Premier.[6]

Counsel for the Debtor entered into evidence an income and expense summary for operations

at Level II from April, 2008 through December 31, 2008.  (Tr. Ex.10, 6/1/2009).   Within that

summary, Mr. Givens reported revenue of $1,155,383.00.  Mr. Givens testified that the figure

included not only bar and restaurant sales but also the revenue generated by the "cover charge"

Level II charges to enter the facility.  The summary statement did not separate total revenue into

these separate categories and Mr. Givens testified that he could not estimate what amount of the "bar

and restaurant sales" were actually generated by the cover charges.  At a later point in his testimony,

Mr. Givens explained that although the summary did not separate the cover charges from the alcohol

---

[5] The Petition and Docket for both bankruptcy cases were entered on the Court's record as Collective Trial Exhibit 12, Tabs I, J, K and L.

[6] Upon examination by Counsel for Performa, Mr. Givens admitted that his ownership interest in the entity known as Level II Entertainment Complex, LLC had been omitted from his Chapter 7 Bankruptcy petition, which he filed in the U.S. Bankruptcy Court for the Western District of Tennessee approximately three months after that entity was formed.

sales as classes of income, there is a very important difference between these two types of income. Alcohol sales are taxed at an almost 25% rate compared to the 9% tax rate placed on the cover charge.[7]

According to Mr. Givens, Level II's point-of-sale system (hereinafter "POS") generates a very detailed breakdown of all of the expenses incurred and sales made at Level II. It does so instantaneously and is accurate to the minute. Further, at the end of every month a detailed summary is generated. Mr. Givens further testified that the UEM income statement, attached to the "Business Plan" was generated with projection data gleaned from Level II's POS records as well as the records of the failed Pat O'Brien's restaurant.

Mr. Givens testified, as supported by the testimony of Mr. Wegener and Mr. Walker, that he refused to provide to Wachovia, Performa or any other creditor, any of the supporting documentation for the sums in the income and expense summary. When asked by opposing counsel why he had refused the information, he indicated that Level II had nothing to do with the reorganized Debtor, that the supporting documentation was proprietary, and that he did not feel that Level II's financial information was pertinent. He did acknowledge, however, that the financial information from Level II was extensively used in preparing the financial projections in the "Business Plan" as presented to the Court and parties.

During the final day of the three-day confirmation hearing, Debtor announced that backup data from Level II, previously refused, would be provided to Wachovia, but only if placed "under

---

[7] In Mr. Givens opinion, this made his projections for "Liquid on Beale" even more conservative when compared to income generated by Level II because Level II had periods of free admission, during which, in his estimation, patrons purchased more alcohol because they did not have to pay a cover charge. At "Liquid on Beale," he testified that he would never have periods of free admission, thereby lowering his alcohol sales but increasing his cover charge income, which is taxed at a lower rate. No documentation from Level II's Point of Sale ("POS") system was offered to support this argument although testimony elicited from both Mr. Wegener and Mr. Givens made it appear that Level II's POS system could easily produce information with this level of specificity.

seal" with no such information being provided to other creditors or available for public view. The Court was not provided with the information and it is not known if the information was, in fact, provided to Wachovia.

Mr. Givens testified that he currently rents a commercial property from Mr. Wegener located at 200 Linden in downtown Memphis and had been renting the property for two years with the intention of opening a night club there. The night club has never been opened, but it is Mr. Givens' intention of opening in the fall or winter of 2009, upon completion of extensive renovations which must first occur. This date coincides with the time frame for the proposed renovation and opening of "Liquid on Beale." On cross-examination, Mr. Givens admitted that with the time necessary for raising capital and completing necessary renovations, there might be no revenue generated by "Liquid on Beale" for the seven months remaining in 2009.

Mr. Onzie O. Horne, Jr. testified at the hearing on behalf of the Beale Street Merchants' Association (the "merchants' association") in his representative capacity as the Executive Director of the Association. The merchants' association is a cooperative association consisting of all of the tenants on Beale Street. Any lease holder on Beale is required to be a member of the association. Mr. Horne testified that every merchant voted to oppose the Debtor's proposed Plan.

One of the reasons the merchants' association opposes the Plan is the proposed limited days "Liquid on Beale" will operate. Mr. Horne testified that tenants of Beale Street who operate on a limited basis, whether temporarily or permanently, adversely affect the flow of customers from one tenant to the next, thereby adversely affecting the tenants on Beale. There is only one other merchant on Beale Street who has attempted to be open on a limited basis and this also has been opposed by the merchants' association.

The merchants' association, based on Horne's testimony, was recently presented with the

12

proposed "Business Plan" by its own bankruptcy counsel.  Prior to the hearing on confirmation, Mr.

Horne testified that the merchants' association had not been contacted by anyone connected with

310 Beale or UEM.  This is important for two reasons: 1) the Debtor had known that the merchants'

association had rejected the Plan as early as May 1, 2009, when the ballot tally was filed with the

Court reflecting the merchants' association's vote to reject the Debtor's Plan; and 2) within the

"Business Plan" itself, UEM stated that it would join the merchants association, play an active role

on Beale Street and that the "interaction and shared interest of the merchants on Beale Street...[are]

critical as it relates to security, marketing and hours of operation."[8]

The statements within the "Business Plan" regarding the importance of UEM's relationship

to  the other tenants on Beale appear to be contradicted by UEM's lack of communication with the

merchants' association as well as UEM's proposed limited operation which is clearly opposed by

the other tenants.

## IV. FEASIBILITY

In order to confirm a plan of reorganization, the requirements set forth in 11 U.S.C. §

1129(a), with the exception of § 1129(a)(8) must be satisfied.  *In re Sis Corp.,* 120 B.R. 93, 95

(Bankr. N.D. Ohio, 1990).  The burden of proof at confirmation is on the plan proponent (here, the

Debtor) to show by a preponderance of the evidence that all of the requirements of § 1129 are met,

including feasibility.  *In re The Christian Faith Assembly,* 402 B.R. 794, 798 (Bankr. N.D. Ohio

2009)(citations omitted).

"Section 1129(a)(11), commonly referred to as the feasibility requirement, allows a court to

confirm a Chapter 11 case only if '[c]onfirmation of the plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor or any successor to the

---

[8] Tr. Ex. 9, II. Executive Summary, unnumbered sixth page.

debtor under the plan, unless such liquidation or reorganization is proposed in the plan.'" *In re Mallard Pond Ltd.*, 217 B.R. 782, 784-785 (Bankr. M.D. Tenn. 1997) Further, while the determination of the feasibility of a proposed plan is necessarily fact-intensive, the plan need only present a "reasonable assurance of success" by sufficiently establishing "a realistic and workable framework for reorganization." *In re Brice Road Development*, 392 B.R. 274, 283 (6th Cir. B.A.P. 2008)(citations omitted).  Relevant factors to a finding of feasibility are:  (1) the adequacy of the capital structure;  (2) the earning power of the business;  (3) economic conditions;  (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 589 (6th Cir. 1986)(citation omitted).

The Debtor's Amended Plan is not feasible.  The plan hinges on the success of a tenant who did not demonstrate to the Court any reasonable assurance that it was commercially viable.  As testified by every witness for the Debtor, there has been no "working capital" raised to date which was essential to UEM's operation of "Liquid on Beale."  While the testimony of Debtors' witnesses as to the amount of working capital necessary to start the club was generally credible, the fact that there has been no capital raised to date remains uncontroverted.  The "Business Plan" has not been distributed to a single potential investor.  Other courts have found, and this Court agrees, that "at the point of confirmation, this source of funding must be shown to be firm as it goes directly to feasibility." *In re Ralph C. Tyler, P.E., P.S., Inc.,* 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993). While Curtis Wegener testified that he was, at all times, ready to make the ongoing payments to Wachovia until such time as the tenant rents generated sufficient revenues, he did not testify that he was willing to provide the business with the initial $400,000.00 in startup capital nor that he was

able to do so.

The Business Plan presented to the Court and the projections included therein are speculative and the Court has not been presented with sufficient information to make a reasonable decision as to the potential earning capacity of "Liquid on Beale."  The financial projections provided were allegedly derived from financial documents of the former Pat O'Brien's, which has not operated for ten months, and on the financial documents of another local nightclub, "Level II." The only  supporting document provided to the Court to justify  the projections in question was the single-page, nine-month summary of income and expenses for "Level II Entertainment Complex, LLC."  While the Debtor's witnesses acknowledged that the backup documentation for the nine-month summary could be easily generated in very specific detail, the documentation was not provided.

In order to present a reasonable assurance of success, the court must be able to determine "whether the things which are to be done under confirmation can be done as a practical matter under the facts."...The Court must determine that the debtor's financial projections presented to support the plan of reorganization are, 'derived from realistic and reasonable assumptions which are capable of being met,'" *Christian Faith Assembly,* at 799 (citations omitted).

The individual responsible for the day-to-day management of the tenant has filed bankruptcy recently, and, as admitted in court, has issues with full disclosure.  Mr. Givens will be the principal operator of the new tenant and an equity member of UEM, yet over $400,000.00 in sales tax debt has not been resolved.  Mr. Givens testified that he is "making arrangements" to pay his tax debt and that he is working on a "offer to compromise" the tax debts, but admitted that the debt remains outstanding.

Cato Walker, UEM's Managing Member, based on his testimony as well as the testimony

15

of others, has decades of experience on Beale Street, but has failed to propose and/or integrate the entire business concept with the merchants association to ensure support in negotiations with its lessor, Performa.  Instead, UEM is now at odds with the merchants association due to the terms of the "Business Plan," including the proposed limited hours of operation which are opposed by the merchants' association.

While the so-called "administrative" parts of the tenant will be run by Cato Walker, who testified he has a very flexible schedule, Curtis Givens will be responsible for the day- to-day operations while he has three other clubs to run that are open on two of the same nights that the proposed tenant will be open and which have the exact same target clientelle as "Liquid on Beale." Mr. Givens will also be opening, at the same time as the projected opening of "Liquid on Beale", another operation at the 200 Linden venue he currently rents from Mr. Wegener.

While the Debtor herein is not required to prove that it "will for certain meet economic projections", the court "cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation...." *Mallard Pond Ltd.,* at 785.  The Plan as proposed is not feasible and does not comply with 11 U.S.C. §1129(11).

Because the Debtor has failed to propose a plan which complies with all the provisions of 11 U.S.C. § 1129, the Plan is not confirmable.  The Court hereby DENIES confirmation of the Debtor's Amended Plan of Reorganization, Docket No. 69 in Chapter 11 Case No. 08-24506, 310 Beale Street Properties, LLC.

Further, based on the Debtor's failure to present Performa with a tenant able to comply with the requirements of the Sublease Agreement, the Court finds that Performa's withholding its approval of the proposed sublease to UEM is reasonable.  The Court hereby DENIES the Debtor's motion to assume the Sublease Agreement, Docket No. 41, in Chapter 11 Case No. 08-24506, 310

Beale Street Properties, LLC.[9]

Based on the Agreed Order Resolving Motion to Dismiss, entered as Docket No. 106 in

Chapter 11 Case No. 08-24510, the Court finds that the Motion for Sale of Property under Section

303(b) [Docket No. 82] and Motion to Dismiss [Docket No. 83] are rendered MOOT.

IT IS SO ORDERED.

This Order shall be served upon the matrices in Case Nos. 08-24506 and 08-24510.

---

[9] On June 9, 2009, Performa and Beale Street Merchants' Association filed a Joint Motion to Reopen Proof, requesting that the Court accept into evidence a police report pertaining to an alleged incident which occurred at Level II subsequent to the Confirmation hearing.  The Court finds that reopening the proof is unnecessary because the Court has denied Confirmation and denied the Motion to Assume Sublease Agreement.  The Court will enter an Order on the Joint Motion to Reopen Proof consistent with this finding.